IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ERNEST ALLEN MITCHELL, JR., ) <br> AIS 254594, ) <br>     ) <br>    Plaintiff, ) <br>     ) <br> vs. ) <br>     ) <br> MARY COOKS, *et al.*, ) <br>     ) <br>    Defendants. ) | CA 20-0509-CG-MU |

## REPORT & RECOMMENDATION

Plaintiff Ernest Allen Mitchell, Jr., an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. This action has been referred to the undersigned for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R). After careful review, it is recommended that summary judgment should be **GRANTED in part** and **DENIED in part**, for the reasons discussed below.

### I. Summary of Factual Allegations[1]

**A. Complaint[2]**

Plaintiff Mitchell alleges the following: On or around December 19, 2018, while he was incarcerated at Fountain Correction Facility, he and another inmate, Ryan Rust, climbed out of their prison dorm and sat for approximately 3½ hours in an Alabama

---

[1] The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *Priester v. City of Riveria Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000).
[2] The operative complaint in this action is Plaintiff's Amended Complaint filed on July 22, 2021. (Doc. 26).

Department of Corrections (ADOC) bus parked nearby waiting for officers to find them and provide help. (Page ID. 129). Mitchell claims he and Rust had previously sought help from Captain Knight because they were in a situation that posed a threat to their physical wellbeing. (*Id.*). Plaintiff alleges that Knight failed to follow proper procedures, acted with complete indifference to the threat and notified the very inmates who were responsible for extorting, assaulting, and threatening him and Rust about the complaints they made to Knight. (*Id.* at 129-130). Rust's father called the prison and spoke with Knight about their situation. (*Id.* at 130). Knight told one of the offending inmates that Rust's father called and "was threatening to put the police in their business" if the extortion and threats continued. (*Id.*). Knight's actions resulted in a confrontation between Plaintiff and Rust and several gang member inmates in which the offending inmates threatened them with death if they did not pay the inmates $1200 by the Friday of the week they escaped. (*Id.*). Plaintiff claims that this would not have happened if Knight had followed proper procedures and locked these inmates up for a 72-hour hold as he investigated the matter. (*Id.*). Plaintiff alleges that Knight's actions violated his rights to reasonably safe living conditions and that Knight failed to protect him after he was made aware of the extortion, assault, and threats. (*Id.* at 131). Plaintiff alleges that Rust was assaulted by other inmates a few days before their escape attempt; however, Mitchell does not allege that he was assaulted. (*Id.* at 130-31).

Because they feared for their safety, Plaintiff and Rust got outside of Fountain's perimeter fence and sat down in the ADOC transport bus on Fountain's property where they waited to be found so that they could talk to someone other than Knight. (*Id.* at 131-132). They were located by the K9-unit and, after Plaintiff was handcuffed behind

his head, one of the officers hit him in the back of his head with either a flashlight or pistol, busting his head open and leaving a large laceration. (*Id*. at 132). When Plaintiff and the officer reached the back gate, the officer kicked the inside of Plaintiff's left knee causing it to swell and asked Plaintiff if he still wanted to run. (*Id*.). Plaintiff told him that he never tried to run and that he was subdued and compliant, thus, there was no need for any force at all. Plaintiff received a disciplinary for "escape without force." (*Id*.).

Plaintiff is suing Warden Mary Cooks, the warden at Fountain at the time of the incident, for failure to protect and failure to train. (Page ID. 134). Specifically, Plaintiff alleges that Warden Cooks failed to investigate the incident and the way her officer conducted himself in handling Plaintiff's situation. (*Id*.). Plaintiff is suing Captain Knight for failure to protect him from harm due to his deliberate indifference in the way he handled the situation when he was aware of the offending inmates extorting Plaintiff and Rust and was aware of the assaults and the threats made by these offending inmates. (*Id*.). Plaintiff is suing Captain Gilchrist, the K9 unit officer, for excessive force based on his assault of him while he was handcuffed. (*Id*. at 135).

Plaintiff is suing Defendants Knight and Gilchrist[3] for $10,000 each, and he requests to be relieved from his 1st degree escape charge in Escambia County. (*Id*. at 136).

**B. Defendants' Answers and Special Reports.**

Defendants Cooks, Knight, and Gilchrist filed their joint answer and special report in support of their positions on November 12, 2021. (Doc. 38). As part of their special

---

[3] Although Plaintiff has named Warden Cooks as a defendant, his complaint does not contain any specific relief request on the claims he has asserted against her. (Page ID. 136).

3

report, Defendants have submitted pertinent documents, which include the Incident Report, Duty Officer Report, Law Enforcement Services Division Report, Plaintiff's Body Chart, Photos of Plaintiff, Plaintiff's Disciplinary Report, and their own Affidavits. (Docs. 38-1 through 38-11).

>The Incident Report states, in relevant part:
>
> On Wednesday, December 19, 2018, Correctional Lieutenant Ruby Salter was assigned as shift commander for B-Nights. At approximately 9:45 p.m., Lieutenant Salter received information in a note that stated, "3 inmates just escaped out the window on the door on the SAP side!!" ... Lieutenant Salter reported to F-dorm and observed the broken window. Lieutenant Salter immediately performed an institutional count. The institutional count came out to be 1051 and should have been 1053. At approximately 10:00 p.m., Lieutenant Salter reported the incident to Correctional Captain Willie Knight. At approximately 10:01 p.m., Lieutenant Salter began an institutional bed check .... At approximately 11:01 p.m., the bed check was completed and revealed that inmates Ryan Rust ... and inmate Ernest Mitchell ... were not accounted for. It was later determined that inmate Rust and Mitchell had escaped through a broken window on a door of the dorm. Surveillance video revealed that inmate Mitchell had broken the window. ... At approximately 11:15 p.m., Captain Gilchrist and the K-9 Unit began searching the outer perimeter of the facility. … At approximately 11:50 PM, inmate Alex Brown ... was identified as the brother of one of the missing inmates. Captain Knight questioned inmate Brown about the incident. Inmate Brown admitted that inmate Brown did go out the window with inmates Rust and Mitchell, but returned back to F-dorm. … At approximately 12:30 a.m., the K-9 Unit recaptured inmates Rust and Mitchell near Fleet Service hidden on an ADOC passenger bus. At approximately 12:35 a.m., inmates Rust and Mitchell were returned to the Fountain Correctional Center. ... At approximately 12:50 a.m., Correctional Officer Travontay Dixon escorted inmate Mitchell to the FCF Healthcare Unit for a medical assessment. Licensed Practical Nurse Akebia Bayne completed a medical assessment on inmate Mitchell that documented an abrasion to the top of the head and an abrasion to the left knee (See attached Medical Report and Photographs). … At approximately 1:40 a.m., K-9 team and the US Marshalls ... transported inmates Rust, Mitchell, and Brown with their property to Holman Correctional Facility. Inmates Mitchell and Russ received disciplinary action for escape. …

(Doc. 38-3, Page ID. 190-91).

4

The Duty Officer Report aligns with the Incident Report. (Doc. 38-2; Page ID. 189). The Investigative Report included the following relevant information:

> On Thursday, December 20, 2018 at approximately 0911 hours, Senior Agent David Jones interviewed Inmate Ryan Rust... at WC Holman CF. Inmate Rust was advised of his rights which he waived. Inmate Rust stated that he escaped due to being threatened by other inmates. Inmate Rust advised that other inmates have been extorting money from him for several months and he had gotten tired of putting up with it. Inmate Rust stated that the other inmates had learned that Inmate Rust's parents were sending him money, therefore the other inmate [sic] felt that they could get Inmate Rust's parents to send other inmates money. Inmate Rust stated that the escape was a spur of the moment thing and was not planned. Inmate Rust stated that Inmate Ernest Mitchell had decided to accompany Inmate Rust when he escaped. Inmate Rust stated that they broke a window out of the door on the North side of the building in the Faith dorm, climbed on top of the ICS building, ran across the trade school building, and climbed down the side of the trade school building before running across the parking lot and hiding inside a State bus on ADOC property. Inmate Rust stated that he did not witness a perimeter vehicle at the time of their escape.
>
> On Thursday, December 20, 2018 at approximately 0954 hours, Senior Agent Jones interviewed Inmate Ernest Mitchell ... at WC Holman CF. Inmate Mitchell was advised of his rights which he waived. Inmate Mitchell stated that he and Inmate Rust decided to escape after Inmate Rust came to him and advised him of being tired of being extorted. Inmate Mitchell advised SA Jones of the same escape method as Inmate Rust (breaking out the door window in the Faith dorm, climbing up the ICS building, etc). Inmate Mitchell stated that they escaped the same day that Inmate Rust mentioned wanting to escape. Inmate Mitchell stated he did not witness a perimeter vehicle at the time of their escape.
>
> On Thursday December 20, 2018 at approximately 1014 hours, Senior Agent Jones interviewed Inmate Alex Brown... at WC Holman CF. Inmate Brown was advised of his rights which he waived. Inmate Brown stated that he was talking on the wall phone in the Faith dorm when he heard a loud crash. Inmate Brown later learned that the loud crash was the glass window being broken by Inmate Rust and Inmate Mitchell. Inmate Brown advised that he returned to his bunk where he remained until officers entered the dorm and determined what had happened. Inmate Brown advised that he does know Inmate Rust and that Inmate Rust's mother had been trying to get Inmate Rust another trial and get him released.

(Doc. 38-4; Page ID. 192-93).

5

The body chart that was prepared by LPN Bayne on December 20, 2018, at 12:50 a.m. showed that Plaintiff had an abrasion on the top of his head and an abrasion to his left knee. (Doc. 38-9; Page ID 225). The photographs taken after Plaintiff was returned to Fountain show that he had a laceration on the top, left side of his head which had caused bleeding down the front of his face to the tip of his nose and that his left knee was red and swollen. (Doc. 38-10; Page ID 226-27).

Each Defendant submitted an affidavit in support of the special report. In his affidavit, Captain Knight states that he remembered Inmate Mitchell and Inmate Rust and that they attempted to escape on the evening of December 19, 2018, while he was off duty. (Doc. 38-1; Page ID 187-88). He was notified of the incident and reported to the facility at about 10:30 p.m. that night. (*Id.*). He interviewed Inmate Alex Brown, who admitted to going out of the window with Inmate Mitchell and Inmate Rust but returned to the dorm shortly thereafter. (*Id.*). He stated that Inmates Mitchell and Rust received disciplinary actions for their escape and Inmate Brown received disciplinary action for absconding. (*Id.*). Captain Knight has no memory or recollection of speaking with either Inmate Rust or Inmate Mitchell about any alleged extortion schemes. (*Id.*). He does not remember receiving a phone call from Inmate Rust's family about any alleged extortion scheme, and he has no memory or recollection of meeting with Inmate Mitchell about any alleged extortion scheme.[4] (*Id.*).

---

[4] Defendants do not dispute that Rust and his family claim to have been extorted by other inmates in or around December 2018. Defendants point out, however, that Plaintiff's claimed involvement as an alleged victim in the extortion scheme is unsupported by anything in the record except for his revised story in his Second Amended Complaint. On October 15, 2020, Plaintiff filed his first Complaint in this case. Doc. 1. Plaintiff's account of his involvement was notably different in that complaint than in his Second Amended Complaint: "*My friend Ryan* was being

6

Defendant Mary Cooks, who was the Correctional Warden III at Fountain Correctional Facility on the date of the incident, stated in her affidavit that she remembered the escape incident involving Inmates Mitchell and Rust. (Doc. 38-7, Page ID. 220-21). She further stated that she is not now and was not then aware of any alleged extortion scheme involving Inmates Mitchell or Rust. (*Id.*). She was not aware of any alleged conversations that took place between Captain Knight and Inmate Mitchell, Inmate Rust or Inmate Rust's family. (*Id.*). Warden Cooks also stated that she was not aware of any injuries inmate Mitchell suffered because of his recapture during his escape attempt. (*Id.*). She stated that she observed him being led down a hallway after he was apprehended and did not see any visible injuries on his person. (*Id.*).

Defendant Jody Gilchrist, a Correctional Canine Coordinator with ADOC, stated in his affidavit that he was called to Fountain Correctional Facility on December 19, 2018, to track two escaped inmates who had gone over the fence behind the facility. (Doc. 38-8; Page ID. 222-24). Upon arriving, he instructed his team to deploy the tracking dogs on the backside of the facility, and once a track was established, the dogs ran around the back of the institution by the ice house, continued around the laundry building, and went toward Highway 21. (*Id.*). Gilchrist surmised that the inmates' ride wasn't there to pick them up because the track then turned back to the facility around

---

extorted and assaulted by some 'BLOOD' gang members." (*Id.* at 4) (emphasis added). The original complaint contained no allegations of Plaintiff meeting with Captain Knight about the extortion scheme. *See id.* Plaintiff filed an Amended Complaint on December 28, 2020, with the same claim that only his "*friend Ryan*" was being extorted and in which he made no allegations of a conversation with Captain Knight. *See* Doc. 12 (emphasis added). On July 22, 2021, Plaintiff filed his Second Amended Complaint, alleging for the first time that Inmate Rust and Plaintiff had both actually been extorted by other inmates. *See* Doc. 26.

behind Fleet Service, which is the vehicle maintenance shop. (*Id.*). The dogs then tracked the two inmates to a bus where the dogs were trying to get in the door of the bus and the windows were fogged up on the bus. (*Id.*). He opened the back door of the bus to look under the bus seats toward the front but couldn't see, so he made entry in the back door of the bus. (*Id.*). One of the other canine officers, Sergeant Morgan, made entry in the front door. (*Id.*). After announcing his presence and getting no reply, Gilchrist noticed drops of blood on the aisle of the bus and, at that time, one inmate stood up towards the front of the bus. (*Id.*). Sergeant Morgan immediately instructed that inmate to put his hands up. (*Id.*). Gilchrist testified that he proceeded to walk towards the first inmate so that he could handcuff him, but about halfway up the bus aisle, the second inmate stood up in the seat. (*Id.*). When the second inmate stood up, it startled Gilchrist, so his immediate reaction was to place the inmate face down to apply handcuffs. (*Id.*). Gilchrist stated that he attempted a two on one takedown, but due to the close proximity of the seats on the bus, he was not able to perform it properly, which resulted in the inmate going face down in between the seats and Gilchrist falling on top of the inmate. (*Id.*). He instructed the inmate to put his hands behind his back, the inmate complied, and he handcuffed him to the rear. (*Id.*). He stated that he noticed that the inmate he handcuffed was bleeding on the top of his head. (*Id.*). Gilchrist stated that, after they escorted the inmates to the back gate and turned them over to Fountain correctional staff, he advised the staff of the inmate's injuries and the incident that took place on the bus. (*Id.*). He also made a notation that blood was observed on the aisle of the bus and that he believed the inmate's injuries were caused before the canine officers made contact with them on the bus. (*Id.*).

### C. Plaintiff's Response to Defendants' Motion for Summary Judgment

In his response to the motion for summary judgment, Plaintiff disputes Defendants' version of the incident. Plaintiff states that Inmate Rust's father will testify that he did speak with Captain Knight concerning the extortion. (Doc. 47; Page ID. 276-79). However, Plaintiff has not submitted an affidavit from Rust's father. He also states that Inmate John Carr, who was present the night of the incident, will testify that Plaintiff did not bust his head when going out the window, as suggested by Gilchrist. (*Id.*). Again, Plaintiff did not include a statement or affidavit from Carr. Plaintiff emphasizes that approximately 4 hours had elapsed from the time that he went out the window until a body chart was completed and photographs were taken. (*Id.*). Plaintiff notes that it was raining on the night of the incident and argues that the rain would have washed any blood from the laceration if it occurred when he went out the window. (*Id.*). He avers that the photographs show fresh blood running down his face, thus this shows that the laceration could not have occurred 4 hours prior. (*Id.*). Plaintiff also notes that no pictures were taken of any blood on the aisle of the bus. (*Id.*). Plaintiff again reiterates that the injury was caused by Officer Gilchrist when he hit Plaintiff while his hands were cuffed behind his back. (*Id.*). He also mentions again that Gilchrist kicked him in the left knee at the back gate, asking him if he still wanted to run. (*Id.*).

### II. Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.") (emphasis omitted); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'") (emphasis omitted) (citation omitted).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing or pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor.

*ThyssenKrupp Steel USA, LLC v. United Forming, Inc.*, 926 F. Supp. 2d 1286, 1290 (S.D. Ala. 2013) (internal citations omitted).

The requirement to view the facts in favor of the nonmoving party extends only to "genuine" disputes over material facts. *Garczynski*, 573 F.3d at 1165. "A genuine dispute requires more than 'some metaphysical doubt as to material facts.'" *Id*. (citations

10

omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence to defeat a motion for summary judgment. *Id*. In addition, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations.").

### III. Legal Analysis

In this action, Plaintiff seeks redress for alleged constitutional deprivations pursuant to 42 U.S.C. § 1983. Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983 (1994). Specifically, Plaintiff alleges that Defendants Knight and Cooks violated his constitutional rights by failing to protect him from a substantial risk of serious harm by failing to take any measures to protect him from the inmates who were threatening him after he allegedly told Knight about the threats and extortion attempts. He also alleges that Warden Cooks is liable for failing to properly train her subordinates and that Knight violated his right to reasonably safe living conditions. Plaintiff alleges

11

that Defendant Gilchrist violated his constitutional rights by using excessive force against him when he hit him in the head and kicked him in the knee after he was in handcuffs and not resisting.

A. **Immunity Defenses**

To the extent Plaintiff is proceeding against the correctional officer Defendants in their official capacities, those claims fail.[5] The Eleventh Amendment, which specifically prohibits suits against "the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State," has long been held to apply "equally to suits against a state brought in federal court by citizens of that state." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998). "The state need not be formally named as a defendant for the amendment to apply; state officials sued in their official capacity are also protected by the amendment." *Id.* (citing *Kentucky v. Graham*, 473 U.S. 159 (1985)). Accordingly, the correctional officer Defendants in this action, all of whom were employed by the State of Alabama Department of Corrections at the time of the incidents alleged in the complaint, are immune from suit in their official capacities. *See Parker v. Williams*, 862 F.2d 1471, 1476 n.4 (11th Cir. 1989), *overruled on other grounds* in *Turquitt v. Jefferson Cnty.*, 137 F.3d 1285 (11th Cir. 1998) ("[S]uits against an official in his or her official capacity are suits against the entity the individual represents."). Thus, Defendants Cook, Knight, and Gilchrist, in their official capacities, are entitled to summary judgment as a matter of law.

---

[5] In his complaint, Plaintiff seeks monetary damages from Defendants Knight and Gilchrist. He makes no claim for damages as to his claims against Warden Cooks. Plaintiff also requests to be relieved from his 1st degree escape charge in Escambia County. Such relief in a § 1983 action is beyond the jurisdiction or authority of this Court and is clearly relief that these specific Defendants cannot provide.

12

Regarding individual capacity claims, "[q]ualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)). The evidence shows that Defendants were acting within their discretionary authority at all times Plaintiff alleged they violated his constitutional rights, and Plaintiff does not dispute this. Thus, Defendants are entitled to qualified immunity *unless* Plaintiff can show that their conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known. *See Belcher v. City of Foley, Ala.,* 30 F.3d 1390, 1395 (11th Cir. 1994). Therefore, the Court must first address whether Plaintiff has set forth a claim for any constitutional violation against any of the Defendants.

**B. Claims Under 42 U.S.C. § 1983**

"In order for a plaintiff to establish a claim under 42 U.S.C. § 1983, he must prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under the color of state law." *Martinez v. Burns*, 459 F. App'x 849, 850-851 (11th Cir. 2012) (citing *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005)). There is no dispute that the named Defendants, as employees of the Alabama Department of Corrections, are state actors for purposes of this action. Thus, to establish his asserted claims, Plaintiff must show the named Defendants, personally, acted to deprive him of a constitutional right.

### 1. Failure to Protect

Plaintiff has asserted that Defendants Knight and Cooks failed to protect him from harm from other inmates. To prevail on an Eighth Amendment failure to protect claim, Plaintiff must prove the following elements: "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; *and* (3) causation." *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995) (citation omitted). To demonstrate the causation element, Plaintiff must prove that the constitutional violation caused his injuries. *Cox v. Nobles,* 15 F.4th 1350, 1358 (11th Cir. 2021). Plaintiff has failed to allege that he has been harmed by any of the inmates who allegedly threatened him or that he has suffered any injury on account of any actions on behalf of these inmates or any other inmates. Therefore, he cannot meet the causation element of this claim. For this same reason, any claim that Plaintiff advances for violating his rights to reasonably safe living conditions also fails. Because Plaintiff cannot prove a failure to protect claim or failure to provide reasonably safe living conditions against Knight or Cooks, they are entitled to summary judgment in their favor on these claims.

### 2. Failure to Train

Plaintiff has also made a claim against Cooks for failure to train Knight in how to handle complaints made to him by inmates concerning threats to their physical well-being. However, Plaintiff admits in his complaint that he cannot prove whether Knight was properly trained. Because Plaintiff has put forth no proof to establish that Cooks had a duty to train Knight or that she failed to properly train Knight, she is entitled to summary judgment in her favor on this claim as well.

### 3. Excessive Force

Plaintiff has asserted a claim of excessive force against Defendant Gilchrist in this action. The Eighth Amendment's prohibition against cruel and unusual punishment, U.S. Const. amend. VIII, governs the use of force by prison officials against convicted inmates. *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999). To establish an Eighth Amendment excessive force claim against Gilchrist, Plaintiff must prove both an objective and subjective component. That is, he must show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation and that Gilchrist "act[ed] with a sufficiently culpable state of mind; i.e., that [he] acted maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992) (citations omitted). Both inquiries are contextual, and "the objective harm inquiry is responsive to contemporary standards." *Thomas v. Bryant*, 614 F.3d 1288, 1304 (11th Cir. 2010). While not every "malevolent touch" by a prison guard amounts to excessive force, a de minimis use of force is cognizable under the Eighth Amendment if it is "repugnant to the conscience of mankind." *See Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010) (quotation marks omitted).

The law is clear that "[p]rison guards may use force when necessary to restore order and need not wait until disturbances reached dangerous proportions before responding." *Bennett v. Parker,* 898 F. 2d 1530, 1533 (11th Cir. 1990); *see also Skrtich v. Thornton*, 280 F.3d 1295, 1300 (11th Cir. 2002). Factors relevant to this determination include the "need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful

15

response." *Skrtich*, 280 F.3d at 1300. "The use of force [however] must stop when the need for it to maintain or restore discipline no longer exists." *Skrtich*, 280 F. 3d at 1304; *see also Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991) (holding that once the need for force ceases, any continued force applied can constitute an Eighth Amendment violation).

      Plaintiff alleges that while his hands were cuffed behind his back, and he was complying and not resisting, Gilchrist, hit him in the head with either a flashlight or his gun, causing a laceration to his head which bled down his face. He further alleged that Gilchrist kicked him in the left knee when they reached the back gate and asked him if he still wanted to run. Gilchrist denies these allegations and insists that he did not hit Plaintiff with any object or kick him in his knee. In support of his position, he submitted an affidavit in response to this suit in which he stated that he entered the bus from the rear, saw Rust stand up in the front of the bus, and, as he was making his way toward Rust, the second inmate, Plaintiff, stood up in a seat about halfway up the aisle. When Plaintiff stood up, Gilchrist stated that it startled him, so his immediate reaction was to place Plaintiff face down to apply handcuffs. Gilchrist stated that he attempted a two on one takedown, but due to the close proximity of the seats on the bus, he was not able to perform it properly, which resulted in Plaintiff going face down in between the seats and Gilchrist falling on top of the inmate. He instructed Plaintiff to put his hands behind his back, Plaintiff complied, and he handcuffed Plaintiff to the rear. He stated that he noticed that Plaintiff was bleeding on the top of his head. Gilchrist stated that, after they escorted the inmates to the back gate and turned them over to Fountain correctional

16

staff, he advised the staff of Plaintiff's injuries and the incident that took place on the bus.

When Gilchrist's version of the incident is compared to Plaintiff's, it is obvious that the parties have presented two distinctly different versions of the facts. The law is clear that courts are required to draw all reasonable inferences in favor of the nonmoving party at the summary judgment stage. Here, Plaintiff specifically claims he was hit in the head and kicked in the knee by Gilchrist after he was handcuffed. He disputes Gilchrist's argument that the laceration occurred when he climbed through the window of the dorm approximately four hours before the body chart was completed. He asserts that the body chart and photographs of his head show blood running down his face and that, because it was raining that night, the blood would not have still been present if he had cut his head four hours prior. Gilchrist's proffered evidence of personal affidavits, incident reports, officer duty reports, disciplinary reports, and other similar documents falls short of establishing "incontrovertible" evidence in support of his position. Thus, at the summary judgment stage of this case, the conflicting evidence must be resolved in favor of the nonmovant, Plaintiff Mitchell.

Viewing the facts and evidence in the light most favorable to Plaintiff, as the court must at this stage, the question, for qualified immunity purposes, is whether Plaintiff has demonstrated that Gilchrist violated his Eighth Amendment rights. "[O]nce the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth Amendment..., and any abuse directed at the prisoner after he terminates his resistance to authority is an Eighth Amendment violation." *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991), *quoted in Pullen v. Osceola Cty,* 861 F. App'x 284,

289 (11th Cir. 2021). "When jailers continue to use substantial force against a prisoner who has clearly stopped resisting -- either because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated -- that use of force is excessive." *Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008), *overruled in part on other grounds as recognized by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010). Pursuant to these authorities, the Court finds that Plaintiff has set forth facts supporting a claim of excessive force against Gilchrist.

Having determined that Plaintiff has stated a constitutional claim, the Court now must address whether the right was clearly established. In *Lewis v. City of West Palm Beach*, 561 F.3d1288, 1291-92 (11th Cir. 2009), the Eleventh Circuit stated:

> A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

In the Eleventh Circuit, "the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution." *Skrtich*, 280 F.3d at 1301. "There is simply no room for a qualified immunity defense when the plaintiff alleges such a violation." *Id.* Here, Plaintiff has alleged that Gilchrist used force for no penological interest but simply to cause him harm. Therefore, Gilchrist cannot defeat Plaintiff's claim by way of a qualified immunity defense at this stage of the proceedings.

Accordingly, the undersigned finds that Plaintiff has carried his burden of overcoming summary judgment as to his excessive force claim against Gilchrist, and it will be Plaintiff's burden to bear at trial to prove his allegations that, while restrained and

not resisting, Defendant Gilchrist hit him in the head causing a laceration to the top of his head and kicked him in the left knee causing swelling and redness.

## IV. CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** that the Motion for Summary Judgment filed by Defendants Willie Knight and Mary Cooks be **GRANTED** as to all claims asserted against them in Plaintiff's complaint (Doc. 26) and that such claims be **DISMISSED with prejudice.** The Court further **RECOMMENDS** that the Motion for Summary Judgment filed by Defendant Jody Gilchrist be **DENIED** as to the claims asserted against him in Plaintiff's complaint (Doc. 26), for the reasons set forth above.

## Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. ALA. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the

19

basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

      **DONE** this the **12th** day of **August, 2022.**

                                <u>/s/ P. BRADLEY MURRAY</u>
                                **UNITED STATES MAGISTRATE JUDGE**